James C. Shah (SBN #260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN #279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
8730 Wilshire Blvd., Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

Katrina Carroll (*pro hac vice* forthcoming)
**CARROLL SHAMBERG LLC**
200 N. LaSalle, Suite 1650
Chicago, IL 60601
Telephone:(872)-215-6205
katrina@csclassactions.com

*Counsel for Plaintiffs and the Proposed Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

ABBIE ROSE and DAVID BECERRA, individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

IQVIA Holdings, Inc., a Delaware corporation, IQVIA Digital Inc., a Delaware corporation, and IQVIA Inc., a Delaware corporation,

*Defendants.*

Case No.: 2:26-cv-01492-WBS-SCR

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **Violation of Cal. Penal Code § 631;**
2. **Violation of Cal. Penal Code § 638.51;**
3. **Violation of Cal. Penal Code § 502;**
4. **Violation of the California Constitution Art. 1, § 1 ;**
5. **Violation of Cal. Bus. & Prof. Code § 17200, *et seq*.; and**
6. **Common Law Invasion of Privacy – Intrusion Upon Seclusion**

**DEMAND FOR JURY TRIAL**

**<u>FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiffs Abbie Rose and David Becerra (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants IQVIA Holdings Inc., IQVIA Digital Inc., and IQVIA Inc. (collectively, "IQVIA," or "Defendants") for surreptitiously collecting consumers' web browsing activities. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other

matters, upon information and belief.

## NATURE OF THE ACTION

1. This lawsuit challenges Defendants' vast data surveillance of California residents' internet activities without their knowledge or consent.

2. Founded in 1982, IQVIA is a data broker and has one of the largest and most comprehensive collections of healthcare information in the world. IQVIA targets its data-gathering efforts at both health care providers ("HCPs") and individual consumers/patients. IQVIA's extensive data-collection operation is structured through subsidiaries coordinated by Defendant IQVIA Holdings, including Defendant IQVIA Digital, Inc. ("IQVIA Digital"), and DMD Marketing Corporation ("DMD"), an IQVIA business and the operator of the Healthcare Communications Network ("HCN"), owned by Defendant IQVIA Inc. ("IQVIA Inc.").

3. The HCN is the core of IQVIA's data operation, and IQVIA's business model relies on the data practices implemented within it. In short, IQVIA facilitates the HCN as a community of healthcare websites that implement IQVIA's web tags, specifically the DMD Tag, to stream sensitive data to IQVIA-controlled domains for future collection and analysis. This enterprise feeds IQVIA's products for both HCP and consumer audiences.

4. Using its vertically integrated network of subsidiaries and technologies, IQVIA has surreptitiously collected the personal information of California residents, including sensitive health-related information, across websites, mobile applications, and platforms, and has leveraged that data for commercial purposes without obtaining valid consent of consumers.

5. Through the invisible DMD Tag, IQVIA secretly intercepts users' communications in real time, including their searches, page views, and website interactions.

6. Further, using a persistent identifier cookie, IQVIA stitches together the data it takes

from these various channels to create detailed digital dossiers on millions of consumers. It knows what articles they read, what products they view, and what sensitive medical conditions they research.

7. Additionally, by facilitating a process known as "ID Syncing" (also known as "cookie syncing") IQVIA and outside advertising and data partners match and share the identifiers tied to an individual user's browser cookies, allowing each party to enrich the data they hold about that user. This process is hidden from users and occurs without their knowledge or consent.

8. IQVIA's surreptitious interception of the substance of users' communications violates California's wiretapping laws. Its systematic collection of IP addresses and routing information without a court order also violates California's pen register statute. And its unauthorized access to users' devices to extract personal data violates multiple other privacy protections under California law.

9. Plaintiffs bring this action on behalf of millions of Californians whose privacy has been invaded by Defendants' unlawful tracking, seeking damages, restitution, and injunctive relief to stop these violations.

## PARTIES

10. Plaintiff Abbie Rose is a citizen of California who resides in Stockton, CA.

11. Plaintiff David Becerra is a citizen of California who resides in Fresno, CA.

12. Defendant IQVIA Holdings describes itself as a "leading global provider of clinical research services, commercial insights and healthcare intelligence to the life sciences and healthcare industries." It is a Delaware corporation headquartered in Durham, North Carolina.

13. IQVIA Holdings offers an integrated suite of platforms, including IQVIA Connected Intelligence, True Identity, AIM XR, the DMD Tag and other cloud-based solutions to its healthcare

organization customers. Using these platforms, IQVIA delivers "actionable insights and services built on high-quality health data, Healthcare-grade AI, advanced analytics, the latest technologies and extensive domain expertise."[1]

14. In its 2025 10-K, IQVIA Holdings states:

> *We* have one of the largest and most comprehensive collections of healthcare information in the world spanning sales, prescription, promotional and social media data, as well as medical claims, electronic medical records, and genomics data, including more than 1.2 billion comprehensive, longitudinal, unique non identified patient records. Our scaled and growing information set contains approximately 68 petabytes of unique proprietary data sourced from approximately 150,000 data suppliers and covering over one million data feeds globally. Based on this data, we deliver information and insights on approximately 90% of the world's pharmaceuticals, as measured by 2024 sales. *We* standardize, curate, structure and integrate this information by applying our sophisticated analytics and leveraging our global technology infrastructure. Longitudinal analysis across disparate datasets is enabled via internally developed fully compliant tokenization engines. This helps our clients run their organizations more efficiently and make better decisions to improve their clinical, commercial and financial performance. *We* have developed a comprehensive portfolio of intelligent, actionable information offerings over a period of many years through innovation, expertise and hard work that differentiates our capabilities to support customers throughout the world.[2]

15. IQVIA Holdings expressly represents that it capitalizes on and analyzes "new sources of data from the internet, such as social media" to "derive valuable insights" for its customers.[3]

16. IQVIA Holdings operates through numerous vertically integrated subsidiaries, without distinguishing them as separate entities in its public filings. Specifically, in its SEC filings, IQVIA Holdings represents that filings are made by "IQVIA Holdings Inc. and its subsidiaries on a

---

[1] *See* IQVIA Holdings Inc. Form 10-K for the year ended December 31, 2025 (the "2025 10-K"), at 5, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001478242/2ce4d51d-bf66-4713-854b-f69a4bb890d4.pdf (last visited 7/24/26).
[2] *Id*. (emphasis added).
[3] *Id*. at 7.

consolidated basis."[4] Indeed, IQVIA Holdings does not differentiate the operations of its subsidiaries.

17. Rather, it represents that "IQVIA Holdings Inc. (*together with its subsidiaries, the 'Company' or 'IQVIA'*) is a leading global provider of clinical research services, commercial insights and healthcare intelligence to the life sciences and healthcare industries. With approximately 93,000 employees, the Company conducts business in more than 100 countries." [5]

18. IQVIA Holdings also tells the SEC and its investors that:

> *We* [IQVIA Holdings and its subsidiaries] are now managed through two reportable segments: Commercial Solutions and Research & Development Solutions. Commercial Solutions provides mission critical information, advanced analytics, technology solutions, health care provider services (including contract sales), and patient engagement services to the Company's life science clients. Research & Development Solutions, which primarily serves biopharmaceutical customers, provides outsourced clinical research, clinical trial and real-world research related services.[6]

Thus, while designating these main business "segments," IQVIA does not specify which subsidiary operates in each particular segment.

19. IQVIA Holdings is the only IQVIA entity specifically named in a Federal Trade Commission ("FTC") Complaint, filed on July 17, 2023, relating to IQVIA's proposed acquisition of the assets of Propel Media, Inc., which drew regulatory antitrust scrutiny.[7] On December 29,

---

[4] *See* 2025 10-K, at 3.
[5] *See* IQVIA Holdings Inc. Form 10-Q for the quarter ended March 31, 2026 (the "2026 Q1 10-Q"), at 8, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001478242/ddaeaab1-f953-49dd-874d-86f445b9a014.pdf (last visited 7/24/26).
[6] *Id*. at 22.
[7] *See* FTC Administrative Complaint, filed July 17, 2023, available at https://www.ftc.gov/legal-library/browse/cases-proceedings/2210196-iqvia-holdingspropel-media-matter (last visited 7/24/26).

2023, the U.S. District Court for the Southern District of New York granted the FTC's request for a preliminary injunction preventing IQVIA Holdings Inc. from acquiring Propel Media. Through the acquisition, IQVIA proposed to own DeepIntent, a leading demand-side platform ("DSP") like DMD, which had already been acquired by IQVIA. DSPs like DeepIntent and DMD enable healthcare advertisers to target healthcare providers and patients in real time across multiple digital channels in the programmatic digital advertising system (also known as the "real-time bidding" ("RTB") auction system), which, as explained below, is the instantaneous matching between buyers and sellers of advertising space.

20. The FTC's Complaint notes that the proposed acquisition would take place in the context of "unprecedented consolidation in healthcare programmatic advertising."[8] It further noted that IQVIA has already acquired DMD as well as two other players in the market (Lasso and MedData Group) and that "[a]long with IQVIA, these four firms in combination would wield outsized power in the healthcare programmatic advertising industry."[9]

21. The FTC's Complaint further describes IQVIA Holdings as "a Fortune 500 company and the world's largest healthcare data provider … that targets healthcare professionals ('HCPs') and other healthcare consumers in the programmatic digital healthcare advertising industry."[10] The FTC further called IQVIA Holdings a "global leader in the collection and licensing of data to the healthcare and life sciences industries" and stated that the entity "licenses its data assets to stakeholders across multiple segments of the healthcare industry, including for advertising purposes."[11]

---

[8] *Id.*, at ¶12.
[9] *Id.*
[10] *Id.*, at ¶1.
[11] *Id.* at ¶5.

22. According to the FTC, "IQVIA also *controls data* that are key inputs to HCP programmatic advertising."[12] Participants in the healthcare industry may view IQVIA Holding's data, which are "particularly important in the industry: (1) identity data (i.e., data that helps identify HCPs online for programmatic advertising) and (2) prescribing data (i.e., detailed prescription and claims data that reveals prescribing behavior)."[13]

23. Defendants IQVIA Inc. and IQVIA Digital, Inc. are Delaware corporations and subsidiaries of IQVIA Holdings. Upon information and belief, IQVIA Holdings' extensive data collection is structured through these subsidiaries.

24. IQVIA Digital is in the business of running marketing campaigns directly to consumer users and also to HCPs. In digital marketing, IQVIA supplies identity, targeting, and analytics technologies for pharmaceutical companies, medical device manufacturers, healthcare publishers, and agencies. Through systems such as its DMD Tag and other cloud-based solutions offered to its customers, IQVIA identifies individual visitor behavior on publisher sites, links it to health-related audience segments, and enables targeting and performance measurement.

25. IQVIA Digital describes itself as a "leading healthcare marketing company … with digital marketing solutions that combine comprehensive data, innovative technologies, and advanced analytics."[14] IQVIA Digital describes its ability to provide "real-time advanced insights" to its customers used to deliver "personalized healthcare marketing experiences." The company also touts its ability to reach consumers directly in promoting its ability to "[a]ctivate and reach *highly qualified* consumer audiences across the healthcare journey and various conditions— from chronic

[12] *Id*. at ¶ 9 (emphasis added).
[13] *Id* at 10.
[14] *See* https://www.iqviadigital.com/about-us (last visited 7/24/26).

illnesses to rare diseases."[15]

26. IQVIA Digital's customers include pharma, agency, partners and publishers (including website publishers). IQVIA Digital tells the pharmaceutical industry that it can "help brands intelligently engage audiences at each stage of the healthcare journey," that it uses "advanced pharma analytics" and ensures "delivery of personalized healthcare marketing content across preferred channels."

27. To its publisher customers, IQVIA Digital even specifically publicized a case study, "*IQVIA Digital Consumer Modeled Audiences Outperformed Other Providers by Significant Margins*," promoting its ability to model consumer audiences so effectively for advertising for oncology and rheumatology brands that it outperformed its competitors, "delivering up to 2x higher audience quality compared to other data providers."[16] Thus, IQVIA Digital boasts about its ability to target people researching diseases and treatments. IQVIA Digital also refers to its network of 5,600 medical websites tracking healthcare professional's activities.[17]

28. Defendant IQVIA Digital is the IQVIA entity that is voluntarily registered as a data broker with the California Privacy Protection Agency pursuant to California Civil Code § 1798.99.82. *See* **Exhibit A** attached hereto. On the same registration, however, IQVIA Digital reports that both it and IQVIA Holdings operate as data brokers, listing as primary websites *both* IQVIA Digital's website, www.iqviadigital.com, *and also* IQVIA Holdings' website, www.iqvia.com. The registration also lists the relevant email address for privacy inquiries relating

---

[15] *See* https://www.iqviadigital.com/solutions/consumer-audiences (last visited 7/24/26) (emphasis added).

[16] *See* https://www.iqviadigital.com/solutions/consumer-audiences and Case Study, available at https://www.iqviadigital.com/resources/case-studies/consumer-modeled-audiences-outperformed-other-providers?hsLang=en (last visited 7/24/26).

[17] See https://www.iqviadigital.com/customers/publisher (last visited 7/24/26).

to IQVIA Digital's data brokerage activities as: privacyofficer@iqvia.com (presumably an IQVIA Holdings employee). On the same registration, IQVIA Digital lists the relevant privacy rights website address as https://privacyportal.onetrust.com/webform/07e8dc4d-6686-403e-9b11-39fe7347d2f4/2f999bd2-c826-498c-a504-894eaf543b6f. This website address links to IQVIA Holdings' website, not IQVIA Digital's website.

29. IQVIA Digital expressly reports that its data collection practices include gathering data on user IDs, individuals' social security numbers, sexual orientation and gender identity.

30. IQVIA Digital maintains a separate website (wwww.iqviadigital.com) from IQVIA Holdings. However, when users visit certain areas of that site (including the Privacy Policy, Terms & Conditions, and "Your Privacy Choices" pages), the user is routed to webpages on IQVIA.com, operated by IQVIA Holdings. If the user clicks on the Facebook social media links on IQVIA Digital's website, they are routed simply to an IQVIA Facebook page, not a page maintained by IQVIA Digital.

31. IQVIA Digital's "Contact Us" page, without distinguishing IQVIA entities, provides that "[i]nformation provided by you may be collected and automatically stored in our database and may be used for sending you additional information about IQVIA and our services. Such information also may be transferred to IQVIA companies in other countries." Included with this text on IQVIA Digital's website is a copyright notice that designates "IQVIA Holdings Inc. and its affiliates."[18]

32. IQVIA Inc. is the owner of the HCN, which, as set forth above, is the core of

---

[18] *See* https://www.iqviadigital.com/contact (last visited 7/24/26).

IQVIA's data operations, and IQVIA's business model. The HCN is a community of healthcare websites that implement IQVIA's web tags, specifically the DMD Tag, to stream sensitive data to IQVIA-controlled domains for future collection and analysis. This enterprise feeds IQVIA's products for both HCP and consumer audiences.

33. HCN, through its Privacy Policy, instructs its clients to contact IQVIA Inc. for any arising matter.[19] Also, when clicking on the "Your Privacy Choices" banner on HCN's website, a banner pops up stating that "The Healthcare Communications Network is owned and operated by IQVIA Inc. Click below to leave this site and continue to IQVIA's Privacy Choices form.":




[19] *See* https://hcn.health/privacy-policy/#:~:text=This%20privacy%20notice%20(%E2%80%9CNotice%E2%80%9D)%20will%20inform%20you%20about%20the%20types%20of%20personal%2C%20behavioral%2C%20and%20other%20information%20that%20the%20Healthcare%20Communications%20Network%20(%E2%80%9CNetwork%2C%E2%80%9D%20%E2%80%9Cwe%2C%E2%80%9D%20%E2%80%9Cour%2C%E2%80%9D%20or%20%E2%80%9Cus%E2%80%9D)%2C%20which%20is%20operated%20by%20DMD%20Marketing%20Corporation%20(an%20IQVIA%20business) (last visited 7/24/26).

34. IQVIA describes in the Privacy Policy at www.iqvia.com that "IQVIA means any entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under *common control with IQVIA, Inc*. For purposes of this definition, 'control' means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise."[20]

35. Additionally, IQVIA Holdings' Annual 10-K Report filed with the SEC for the year ending December 31, 2024 describes IQVIA, Inc. as "our wholly owned subsidiary through which we conduct our operations, IQVIA Inc. [...]."[21]

36. Both IQVIA Inc. and IQVIA Digital Inc. share the same registered office address, according to North Carolina's business registry.[22]

37. Taken together, the foregoing allegations demonstrate how Defendants are not truly independent entities but rather are alter egos and interrelated components of a single data brokerage enterprise that owns and operates IQVIA and is responsible for the data collection practices alleged herein. Plaintiffs allege each Defendant jointly and/or individually infringes their privacy rights, as explained below.

## JURISDICTION AND VENUE

38. Plaintiffs filed their original Complaint in the Superior Court of the State of

[20] *See* https://www.iqvia.com/about-us/privacy/privacy-policy#:~:text=%E2%80%9CIQVIA%E2%80%9D%20means%20any,contract%20or%20otherwise. (last visited 7/24/26).

[21] *See* https://s201.q4cdn.com/580005511/files/doc_financials/2024/q4/IQV-2024-12-31-10K_Filed-with-exhibits.pdf, at p. 41 (last visited 7/24/26).

[22] *See* https://sosnc.gov/online_services/search/Business_Registration_profile/23328515 (IQVIA Digital) and https://sosnc.gov/online_services/search/Business_Registration_profile/4581127 (IQVIA Inc.) (last visited 7/24/26).

California, County of San Joaquin on April 6, 2026.

39. Defendants removed this matter to this Court on April 9, 2026, pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. 1332(d) and 1453(b) because the amount in controversy of the proposed class claims exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Defendants.

40. As the removing party, Defendants had the burden to show that this Court has subject matter jurisdiction in this matter. As of the date of this filing, Plaintiffs have not moved to remand this matter back to state court and do not contest the Court's jurisdiction in this matter.

41. As Plaintiffs originally pled, Plaintiffs maintain that jurisdiction is proper in the Superior Court of the State of California, County of Joaquin pursuant to Article VI, Section 4 of the California Constitution and Code of Civil Procedure Section 410.10.

42. As Plaintiffs originally pled, Plaintiffs maintain that the Superior Court of the State of California, County of Joaquin has personal jurisdiction over Defendants because Defendants conduct significant business throughout the State of California. In addition, as pled above, Defendant IQVIA Digital voluntarily registered itself as a data broker with the California Privacy Protection Agency pursuant to California Civil Code § 1798.99.82 and included in that registration information concerning it and IQVIA Holdings.

43. This registration constitutes an express acknowledgment that IQVIA collects personal information about California consumers with whom it does not have a direct relationship, and represents a deliberate decision to avail itself of the privilege of conducting data brokerage activities directed at California residents.

44. By registering as a California data broker, IQVIA submitted itself to California's

regulatory jurisdiction and accepted ongoing obligations under California law, including the requirement to maintain its registration annually and to permit California consumers to submit deletion requests.

45. As Plaintiffs originally pled, Plaintiffs maintain that the Superior Court of the State of California, County of Joaquin has personal jurisdiction over Defendants because their contacts with California are deliberate, not incidental. As demonstrated herein, IQVIA actively processes users' IP addresses to derive California-specific location data. IQVIA records this California location alongside users' browsing activity and persistent identifiers, and use it to enhance the commercial value of its advertising services. Each such identification of a California user constitutes a purposeful contact with California.

46. As Plaintiffs originally pled, Plaintiffs maintain that the Superior Court of the State of California, County of Joaquin has personal jurisdiction over Defendants because, upon information and belief, Defendants derive direct financial benefit from identifying California users. Advertisers pay premium prices to reach consumers in specific geographic markets, and California—the nation's most populous state—is among the most valuable. When IQVIA identifies a user as a California resident, it monetizes that California-specific information. IQVIA's California contacts thus generate revenue, not merely incidental data.

47. As Plaintiffs originally pled, Plaintiffs maintain that venue is proper in the Superior Court of the State of California, County of Joaquin pursuant to Code of Civil Procedure § 395.5 because the obligation or liability giving rise to this action arose in this county.

## COMMON FACTUAL ALLEGATIONS

*A. Programmatic Digital Advertising*

48. IQVIA is a major player in "programmatic digital advertising" in the health care industry. Programmatic digital advertising (also known as the "real-time bidding" ("RTB") auction system), which is the automation of digital media buying, revolutionized the negotiations between advertisers and publishers of advertisements.

49. Historically, an advertiser and publisher individually contracted for an advertising campaign to appear on the publisher's site (e.g., placing an advertisement in a newspaper or on a TV show) at a predetermined price over a set period of time. In contrast, programmatic advertising is a fully automated system of digital advertising that, through an algorithm, facilitates an auction in microseconds across many digital advertising spaces. Programmatic digital advertising allows advertisers to set bids for placing advertisements in certain sets of media space online, including websites. As such, unlike historical advertising, online advertisements are bought and sold in enormous volumes in mere fractions of a second, using highly sophisticated tools and automated exchanges more akin to a modern stock exchange than a bilateral contract negotiation.

50. DSPs (demand-side platforms, like DMD and DeepIntent, described above) are used to buy programmatic digital advertising. The clients of healthcare DSPs are healthcare companies, such as pharmaceutical manufacturers, biotechnology companies, and their advertising agencies, who inform potential consumers and healthcare professionals about their products through digital advertising.

51. While still emerging, the market for healthcare professionals' programmatic advertising—a subset of the total healthcare digital advertising industry—has grown significantly in recent years, accelerated by the COVID-19 pandemic, which caused healthcare companies to shift sales away from traditional in-office physicians and toward online marketing.

52. DSPs include the algorithm that facilitates the buying of digital advertising space. DSPs act on behalf of advertisers by automatically bidding in ad auctions and placing ads in front of targeted users on publisher platforms. DSPs often charge advertisers on a per-impression basis, typically expressed in terms of cost-per-thousand impressions.

53. Healthcare DSPs generally target two distinct sets of audiences: individual consumers and healthcare professionals, in real time, across a variety of media platforms (such as connected TV, banner ads, email, audio, and more). Healthcare DSPs facilitate programmatic advertising campaigns through automated purchases and placement of advertising inventory on media platforms. Moreover, healthcare DSPs and their advertising clients can measure the efficacy of digital ad campaigns—in clicks, impressions, prescriptions written, or other metrics—to further optimize their operations.

54. The health care programmatic advertising market is highly concentrated, with three healthcare DSPs dominating the space.

55. IQVIA is a global leader in the collection and licensing of data to the healthcare and life sciences industries. IQVIA licenses its data assets across multiple segments of the healthcare industry, including for advertising purposes.

56. Before 2022, IQVIA did not have the capability to conduct programmatic advertising in-house. Instead, it supplied data to outside DSPs and licensed data to healthcare advertisers for use in the DSP of their choice for programmatic advertising campaigns. IQVIA then acquired DMD as well and two other players in the DSP market (Lasso and MedData Group). IQVIA thus now has several businesses within the supply chain of healthcare digital advertising to deliver data and services to its customers.

57. In the digital health-marketing ecosystem, IQVIA now acts not only as a data collector, but also as a data broker and advertising partner in the programmatic advertising market. The data it compiles is used to target individuals with highly tailored ads, assist in real-time bidding for online advertising within the programmatic digital advertising space, and enhance the commercial value of health-related marketing. IQVIA generates approximately $15 billion in annual revenue, positioning it as one of the most influential data and marketing technology providers in global healthcare.

*B. The Healthcare Marketing and Data Analytics Industry*

58. IQVIA operates within the healthcare marketing and data industry, a highly specialized sector devoted to equipping pharmaceutical companies, medical device manufacturers, healthcare publishers, and agencies with the data and analytics needed to understand audiences, plan engagement strategies, and measure marketing campaign effectiveness.

59. The industry connects healthcare marketing with clinical and real-world data, enabling companies to translate complex medical and behavioral information into actionable intelligence. It plays a central role in the commercialization of healthcare by transforming fragmented digital interactions, across healthcare professionals and consumer audiences, into measurable insights that guide how billions of dollars in life-science marketing and

communication budgets are allocated each year.

60. The healthcare marketing and data industry forms a critical component of the broader health-information economy, empowering brands to design evidence-based campaigns, reach verified audiences (both consumers and HCPs), and evaluate marketing performance. In 2024, more than $20 billion was spent on pharmaceutical and healthcare advertising across the United States, reflecting the growing reliance on data-driven marketing to engage both clinicians and consumer patients.

61. In digital marketing, IQVIA supplies identity, targeting, and analytics technologies for pharmaceutical companies, medical device manufacturers, healthcare publishers, and agencies. IQVIA integrates its expertise in data analytics and clinical research with marketing technology through platforms such as AIM XR, the DMD Tag, and the HCN.

62. As explained in detail below, IQVIA's DMD Tag is implemented across participating websites in the HCN. When users, both healthcare professionals and individual consumers, visit these sites, IQVIA collects the details of their interactions, segments audiences, and shares it with advertising partners together with the users' DMD Tag identifiers. This process enables extremely precise audience targeting, improves ad bidding and monetization, and, among other effects, facilitates IQVIA's advertising partners' participation in programmatic advertising auctions by supplying richer audience data and verified health-related segments. These systems allow IQVIA to function simultaneously as an infrastructure provider, data intermediary, and marketing partner, connecting the scientific, commercial, and media dimensions of the healthcare industry.

63. Through the DMD Tag deployed on scores of popular websites, IQVIA identifies consumer visitor behavior, links that behavior to health-related audience segments, and enables

consumer ad targeting and performance measurement for advertising campaigns. IQVIA is one of the most influential healthcare data and marketing technology providers in the world.

*C. IQVIA's Surveillance Enterprise*

64. IQVIA strengthened its marketing data capabilities with the 2021 acquisition of DMD, integrating DMD into IQVIA's marketing and data operations. DMD's proprietary technologies, including the "DMD Tag" (formerly, the "AIM Tag"), serve as core infrastructure to the HCN. HCN websites rely on IQVIA's identity resolution tools for audience targeting, measurement, and analytics. As a result, IQVIA exercises substantial control over how healthcare audiences are identified, tracked, and monetized across a broad swath of healthcare-related digital media.

65. IQVIA has developed a business model centered on the surreptitious surveillance and collection of consumer data through two primary channels. First, it deploys tracking technologies called the DMD Tag and "dmd-sid4" cookie, which website publishers embed on their sites to monitor visitor behavior.

66. The DMD Tag is a randomly-generated alphanumeric identifier performance cookie used for website monitoring and optimization. It collects information about user behavior, such as which pages are visited most often. It also serves as a unique identifier to recognize browsers across sites and over time. The DMD Tag is stored in the user's browser for 400 days.

67. The dmd-sid4 is a cookie implemented for targeting purposes across various websites. It is stored on a per-session basis.

68. The DMD Tag and dmd-sid4 cookie allow IQVIA to establish persistent identifiers (through the DMD Tag) and session based identifiers (through dmd-sid4), which IQVIA then uses itself to identify users and logs user interactions across participating HCN sites. These identifiers

allow IQVIA to track behavioral patterns, associate visits with audience segments, and measure consumer ad engagement over time.

69. Second, through cookie syncing (also known as "ID syncing"), IQVIA's DMD Tag synchronizes pseudonymous IDs between IQVIA and third-party partners. This process enables mutual user-browser recognition and cross-platform audience linkage while maintaining full database access within IQVIA's infrastructure. IQVIA's partners rely on this mapping to match IQVIA's segments with their own targeting and measurement systems.

70. The DMD Tag and dmd-sid4 cookie allow IQVIA to persistently recognize individual browsers, facilitate ID syncing with partners, and maintain continuity of profiling across websites.

71. Importantly, IQVIA collects and transfers this data regardless of a user's identity, whether a health care professional or an individual consumer. Personal information is gathered and either retained within IQVIA's databases for commercial exploitation by IQVIA itself or immediately transmitted to its advertising partners without user consent, beginning immediately upon a site visit and continuing with nearly every action taken on the webpage. IQVIA's advertising partners then use these data points to refine ad targeting, combine them with offline or third-party datasets, or redistribute them through additional monetization channels.

72. IQVIA operates without any direct relationship with the end user. It observes, processes, and profits from personal data entirely in the background, beyond the user's awareness or control. These practices create conditions for unauthorized interception and disclosure, in violation of privacy laws.

73. As alleged above, IQVIA is a registered data broker in California. As explained by the California Privacy Protection Agency ("CPPA"), "[a] data broker is a business that collects

personal information about consumers from various sources and sells that information to other companies, even when the consumer did not interact with the business for its products or services."[23] Data brokers take and sell consumers' personal information, including highly sensitive information such as "social security numbers, precise geolocation, health-related information, browsing history, and more."[24]

74. On its current CPPA registration, as noted above, IQVIA reports that it collects highly personal information, including data on user ID's and social security numbers, sexual orientation and gender identity. As alleged herein, however, these disclosed categories do not constitute the universe of collected data, which also includes broad swaths of information about users and their behavior on various websites including: the visitor-id cookie identifier; the complete URL of the page being visited; search terms entered on the website; referring page information showing how the user arrived; timestamps of all activity; browser and device information including type, operating system, and settings; IP addresses; and contextual information about the page content.

75. The value IQVIA derives from the consumer information it amasses is further reflected in recent investigative reporting by WIRED Magazine ("WIRED"), which found that IQVIA and other brokers embedded code on their websites instructing major search engines—such as Google and Bing—to hide their opt-out or data-deletion instruction pages from search results. WIRED conducted an investigation of 499 registered data brokers in California, finding that 35 of them including IQVIA Digital had deployed code to stop these pages from showing up in searches. According to WIRED, IQVIA Digital did not respond to a request for comment. This

[23] https://cppa.ca.gov/data_broker_registry/ (last visited 7/22/26)
[24] *Id.*

practice underscores both the commercial importance of the data that IQVIA surreptitiously collects and the lengths to which the company is willing to go to impede consumers from exercising their privacy rights and control over their personal information.[25]

76. Indeed, on August 13, 2025, Senator Maggie Hassan, Ranking Member of the Senate Joint Economic Committee, wrote a letter to the CEO of IQVIA noting the WIRED investigation and stating that:

> "Data brokers and other online providers have a responsibility to prevent the misuse of consumer data, and Americans deserve to understand if and how their personal information is being used. According to Pew Research, the vast majority of Americans claim to 'understand little to nothing about what companies are doing with their personal data' and feel that they have 'little to no control' over its use. **Concerningly, new technologies have enabled data brokers to collect even more personal information from online sources, adding to data privacy concerns. Hiding or burying opt-out options for data collection only compounds the difficulties that Americans encounter when attempting to protect their privacy – and in fact, these 'dark patterns' have 'the substantial effect of subverting or impairing a consumer's autonomy, decision making, or choice,'** according to an enforcement advisory from the California Privacy Protection Agency."[26]

### D. *IQVIA's Instantaneous Collection of User Data*

77. IQVIA provides website publishers with tracking technology through, among others, the DMD Tag. As set forth above, this technology, when embedded on websites, secretly collects extensive information about visitors and transmits it directly and instantaneously to IQVIA's servers.

78. An ad tag like the DMD Tag is a piece of computer code that website owners

---

[25] Colin Lecher & Tomas Apodaca, Data Brokers Are Hiding Their Opt-Out Pages From Google Search, WIRED (Aug. 12, 2025), https://www.wired.com/story/data-brokers-hiding-opt-out-pages-google-search/

[26] *Letter from Senator Maggie Hassan, Ranking Member, Joint Economic Committee, to Ari Bousbib, Chairman & CEO, IQVIA Digital, Inc., Aug. 13, 2025, JEC Letters to Data Brokers (redacted) (on file with U.S. Joint Economic Committee), available at* https://www.jec.senate.gov/public/_cache/files/d5e8d15e-c22e-401c-b909-329e68db25fb/8.13.25-jec-letters-to-data-brokers-redacted.pdf

embed on their webpages. Despite being called a "tag," it is not actually a visible element but a page containing an ad tag, the browser is forced to communicate with the server that hosts the tag, such as those hosting HCN website pages like "aim-tag.hcn.health."

79. During this forced communication, the ad tag causes the user's browser to transmit information about the user and their browsing activity directly to HCN. This includes both information that the browser automatically sends with any web request and additional data that the tag's JavaScript code extracts from the user's device and browsing session.

80. To track users over time and across different websites, the DMD Tag utilizes cookies. A cookie is a small text file that a web server instructs a browser to store on the user's device. Once stored, the cookie is automatically included in future communications with that server, allowing the server to recognize returning visitors.

81. As set forth herein, the DMD Tag sets a persistent "dmd-tag" cookie on users' devices. This cookie functions as a unique and lasting digital identifier, similar to a permanent name tag, that follows the user's browser across different websites and browsing sessions, enabling IQVIA to build comprehensive profiles of users' long-term browsing habits.

82. When a user visits any website containing the DMD Tag, the tag reads this visitor-id cookie and transmits it to IQVIA along with information about the user's current activity. This allows IQVIA to connect the user's activity across different websites and over time, building an increasingly detailed profile of their interests, behaviors, and characteristics. The DMD Tag is stored in the user's browser for 400 days.

*1. Swaths of Data Collected Through the DMD Tag*

83. When the DMD Tag executes on a webpage, it collects and transmits extensive data about users including: the visitor-id cookie identifier; the complete URL of the page being visited;

search terms entered on the website; referring page information showing how the user arrived; timestamps of all activity; browser and device information including type, operating system, and settings; IP addresses; and contextual information about the page content.

84. The IP address that the DMD Tag collects is a globally unique numerical identifier that guides or routes communications across the internet. Often written as four sets of numbers separated by periods (e.g., 192.555.455.145), Internet Service Providers assign IP addresses to networking devices such as modems or routers (including household modems and routers). IP addresses function as the essential addressing system of the internet. Just as a telephone number is a unique number necessary to route a phone call to the correct household, an IP address is a unique number necessary for routing internet communications to the correct location. And just as a phone number can reveal the general location of the caller, an IP address reveals the general geographic location of the internet user, often down to the city level, and sometimes to the level of specific ZIP codes.

85. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking purposes. IP addresses can allow companies to target advertisements to users in specific geographic areas with over 95% accuracy. For example, businesses who are trying to reach specific demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis or associated with particular events, such as job fairs or festivals. By using IP addresses to target specific households, businesses or events based on their location, advertisers can avoid wasting money on ads unlikely to be seen by their target audience.

86. IP addresses are not openly accessible or discoverable at large. If a user is not actively transmitting data packets, their IP address remains private and is not exposed to the

broader internet or third parties. However, the broader term "IP address" used in this complaint should be distinguished from the term "private IP address," which refers to a different, specific type of IP address used within internal networks, which is not routable on the public internet and does not reveal anything about a user's geolocation. Private IP addresses are not relevant to or otherwise addressed in this complaint.

87. An IP address is "routing, addressing, or signaling information." It is "routing" or "signaling" information because it sends or directs the user's communication from the router in their home or workplace to the website they are communicating with, ensuring that the web content being accessed (whether that be websites, streaming content, emails, or other data) reaches the user correctly. It is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

88. When combined with cookies, IP addresses can be powerful tools for identifying specific individuals and tracking their browsing habits. A cookie assigns a stable identifier to a particular browser, while an IP address identifies the network connection used at that moment. When the same cookie identifier reappears from different IP addresses over the course of a day or week (for example, a residential IP in the morning and evening and an employer's IP during working hours) the company can associate those networks, and the locations they imply, with the same browser. Over time, that pattern distinguishes that browser from others who share the same network and maps routine usage. Because cookies persist across IP changes (mobile data, travel, dynamic addressing), they bridge sessions and provide continuity, while IP information supplies location and network context. Used together, cookies and IP addresses enable highly granular tracking of a browser's activity across sites and over time.

89. The DMD Tag functions as a pen register, systematically recording users' IP

addresses and routing information from thousands of websites as an undisclosed third party that the users have no knowledge of or relationship with.

90. This data collection begins the moment a page loads, before users have any opportunity to review privacy policies or consent to tracking. The transmission to IQVIA's servers occurs automatically in the background, invisible to users.

91. The DMD Tag intercepts communications between users and website operators while these communications are in transit. As data travels between users' browsers and a website's servers, the DMD Tag intercepts and reads these transmissions in real-time, capturing clicks and page visits as they happen and form entries as they are submitted. IQVIA reads or attempts to read these communications by analyzing and interpreting the data streams mid-transmission, automatically identifying and classifying data types and values, extracting personal information, search queries, and behavioral data while the communications are still traveling to their intended destination.

*2. IQVIA's ID Syncing and Persistent Cross-Site Tracking*

92. To recognize users across domains and platforms, IQVIA and its third-party data partners use cookie syncing (also known as ID syncing). This process allows distinct systems to align their respective user identifiers through server-side exchanges or client-side pixel fires. ID syncing is done via "redirects," "pixel calls," and "match tables"—enabling persistent cross-site tracking before any ad auction occurs. The process is widespread but opaque. It exposes user data to numerous unseen third parties without user awareness or control.

93. Cookie syncing addresses a business challenge for advertisers: different data and advertising businesses assign different identifiers to the same user. One might know a user as "User-123" while IQVIA knows them as "dmd-user-id-ABC." Without synchronization, these

platforms cannot coordinate their tracking and advertising efforts.

94. The syncing process occurs *automatically* when users visit websites. Their browser is invisibly redirected through multiple advertising domains in rapid succession, often dozens of redirects within seconds. During each redirect, platforms read their tracking cookies, share identifiers with each other, and build translation tables.

95. When IQVIA engages in cookie syncing, it enables both IQVIA and its data partners to match the personal information they each hold, linking identifiers received from IQVIA with information those partners have collected about users across the internet. As such cookie syncing allows IQVIA and its data partners to enrich the user profiles they hold.

96. The result of ID syncing activities between IQVIA and its third-party partners is the invisible profiling and commercialization of broad swaths of user data, including the following types of user-related information:

- Pseudonymous Identifiers: dmd-tag (persistent browser ID), dmd-sid4 (session ID), pageview ID, tag ID, AIM Tag version.
- Page and Interaction Context: full page URL, page title, referrer URL, and time of visit.
- Event Metadata: timestamps, session duration, pageview frequency, and related headers.
- Geographic Signals: country and state codes, and in some cases ZIP or IP-derived location data.
- Device and Environment Details: user-agent string, browser type, and indicators of storage or cookie access.
- Partner Synchronization Details: partner name or ID (e.g., DSP's like DeepIntent or Lasso) and shared pseudonymous references for cross-system audience mapping.

a. Examples of IQVIA's Deployment of Tags on Sensitive Websites

97. IQVIA's technology is deployed across numerous websites, including those containing highly sensitive medical and health information. The following examples demonstrate how this tracking operates without user consent:

98. **Drugs.com:** This well-established HCN medical website offers in-depth drug information, side effect databases, dosage guides, and drug interaction tools. It also offers other popular services, such as pill identification. The website serves as a health information resource for millions of users across the United States, including those seeking specific guidance related to their prescribed medications and other health matters.

99. When a user visits drugs.com, their device information, together with sensitive health-related browsing and search context, is immediately transmitted to IQVIA via the DMD Tag. This includes full URLs and query parameters that may reference specific medical conditions, symptoms, or treatments. These transmissions occur through IQVIA's web tag script secretly embedded in the website, without notifying the user or obtaining their explicit consent.

100. By way of example, a user might search for information about the drug Lorazepam, which is a drug belonging to a group of medications called benzodiazepines specifically used to treat diagnosed anxiety disorders. The user then may use the pill identifier feature to identify a prescribed medication with a specific imprint. All of this data, which reveals both the user's medical condition and the drug prescribed to treat that condition, is captured, logged, and transmitted to IQVIA's databases, via a single and continuous network request, where it is associated with the user's persistent DMD Tag identifier for further enrichment by IQVIA's partners.

101. The following images illustrate the example above and demonstrate the manner in which the data is captured and used.

**The drugs.com homepage appears as follows (fig. 1):**



**The user then inputs a search for the drug Lorazepam in the search bar (fig. 2):**



**The user then enters the drug's description page for further information on Lorazepam (fig. 3):**



**The embedded DMD Tag automatically triggers a request to HCN-IQVIA servers, carrying a persistent identifier and health-related data such as URLs and search terms (figs. 4 and 5):**

**Request**

Pretty Raw Hex

```
POST /api/v4/aim-reader/dom-content-loaded HTTP/2
Host: aim-tag.hcn.health
Cookie: dmd-tag=[redacted]b1; dmd-tag=[redacted]b1;
dmd-sid4=
[redacted]
Content-Length: 3612
Sec-Ch-Ua-Platform: "macOS"
User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/141.0.0.0 Safari/537.36
Sec-Ch-Ua: "Google Chrome";v="141", "Not?A_Brand";v="8", "Chromium";v="141"
Content-Type: application/json
Sec-Ch-Ua-Mobile: ?0
Accept: */*
Origin: https://aim-tag.hcn.health
Sec-Fetch-Site: same-origin
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Sec-Fetch-Storage-Access: active
Referer:
https://aim-tag.hcn.health/iframe.html?client-origin=https%3A%2F%2Fwww.drugs.com&pageview-id=[redacted]
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Priority: u=1, i

{
  "clientApiKey":"[redacted]",
  "clientCookiesRaw":
  "_scor_uid=[redacted]a6; _ga=GA1.1.97910779.1762160094; dmd-tag=[redacted]
  [redacted]b1; bm_lso=F0295F65696103346ECB639A3CA07FFF9867D0C1E8193111C16FC53C18A3F9DF~YAAQ7NfOF8tm
  EjGaAQAADfMmSQWTGkKCZkE47GI5SraCckJt3xhU3TBnYQqpepj24GGEb2kFtWcKTaQ9WnHpptSPjkOdKFsiMDACNFRcqWLbFQjbqUn
  dyxP9n1W4KIDyceAIWgqG/SpAReuw1tVYzkeCohLIS3HfIuB1vLnM6Vs9s8uHaeYdnM9Bm36RNM+z4p7/hSBhOe/dO+wdifZWdktyw7
  5z9ACrHF51MCc9HgDkSSXY0dqo0Tb3ewouLQJ1XPRmpe32oROvfCRhBGxI4v7kUSTWf5HrEMSX3v5szy7Aiqp+k/+Ii13qg8tcdNaZo
  zR4tQ0yc1nV1d3PXpWR8CCSuxnquAaH3x98lLRY1UliRQUmgS7IMCCdNs+kcLAF21YX6WV8Es9oqHxVycxR/ORzFc9Nx7+5q1d/wjHv
  TD2W+dmbUbLhJVmT3Un3iVybJTWVhAA/IzL7r+2DjX4=^1762163882013; ddc-detect-cookie=1; bm_so=AE53C980B0175E83
  761BA91E22E5A079B9B397EFB755944AA7F81696F1B9322A~YAAQ7NfOF2pqEjGaAQAAunwnSQWj1CQID8jp96AYgjj8x1CuBA14Ow
  h622L8nPhkInErXJmYqv31VySNYYowLvTdD1Tc3LzQYDNiWe3JLlGeuR32Mz1O1JRuEosX4h+trRytkDLj3LyDgt7VaJ7WNxd/mIGxQ
  auLBVq8kgsOn7+/x2xvR3ZV2stc4iLXoJwS31KA7/o3QFrDlA6UZuEdsEd5gI9w1O/nHg4NN8pO9F3osjNIFsEYhWeU+k0zABDalJjm
  jrpx6JDEdiMJBlSFfDhiNWvcF8iDdKFwj+LdQlm8kobGsl6gjY4pjRHzUpwYVm93HoTWu1x2c5fSENaWQUwA6UycqAUFWbbWSmulp+0
  +hF6lj/iR02lvZs9AjcElG3YnTjnrjamxwP3SvNAGaCyhfvNmWbMc2tk1JvFyp/BA2+x/vc5I8h7Q3OtdPQSid0ScR6CyMnMLhKOD16
  s=; ddcath1=d1488; pbjs_sharedId=b6ba6988-2756-4bba-bea4-26a51772221d; _lr_retry_request=true; _lr_env_
  src_ats=false; __gads=ID=46520f88f3635939:T=1762163918:RT=1762163918:S=ALNI_MZPm4ijAPDr00ZANbJ3-jnBowSy
  iA; __gpi=UID=000012be3df830f6:T=1762163918:RT=1762163918:S=ALNI_MY28TmfF9nGTlT_Ns9eHljhbreD_A; __eoi=I
  D=d8430393ba11e349:T=1762163918:RT=1762163918:S=AA-AfjbjKdMBynM8QB3tN4-bL7Ws; FCNEC=%5B%5B%22AKsRol9M4U
```

```
00}",
"clientMethod":"pageview",
"clientReferrerUrl":"https://www.drugs.com/search.php?searchterm=lorazepam&a=1",
"clientRequestCookies":[
  {
    "key":"dmd-tag",
    "value":"[redacted]"
  },
  {
    "key":"dmd-sid4",
    "value":
    [redacted]
  }
],
"clientRequestQueryParams":[
],
"clientRequestUrl":"https://www.drugs.com/lorazepam.html",
"isPageview":true,
"pageTitle":"Lorazepam Uses, Dosage & Side Effects - Drugs.com",
"pageviewId":"b966d050-b89b-11f0-991e-27281c9713b6",
"prerender":false,
"session":{
  "id":"a3fe7790-b89b-11f0-a32a-a1d41cee0d83",
  "timestamp":1762163906000
},
"sessionId":"a3fe7790-b89b-11f0-a32a-a1d41cee0d83",
"tagId":"[redacted]"
}
```

**The user then enters drug parameters into the pill identifier feature on drugs.com (fig. 6):**



**The results are displayed (fig. 7):**



**The embedded DMD Tag triggers a request to HCN-IQVIA servers, carrying a persistent identifier and health-related data such as page titles and drug imprints (figs. 8 and 9):**

**Request**

Pretty Raw Hex

```
POST /api/v4/aim-reader/dom-content-loaded HTTP/2
Host: aim-tag.hcn.health
Cookie: dmd-tag=[redacted]b1; dmd-tag=[redacted]b1;
aaef72dc-3586-472b-b5e6-bca780bd6a4e=
{%22lastUpdated%22:1762163947009%2C%22signalData%22:{%22aim_version%22:%224.52.0%22%2C%22event_timestamp%22:%222025-11-03%2009:59:07%22%2C%22country_code%22:%22%22%2C%22country_description%22:%22%22%2C%22dgid%22:%22%22%2C%22first_name%22:%22%22%2C%22identity_type%22:%22UNK%22%2C%22last_name%22:%22%22%2C%22npi_number%22:%22%22%2C%22hcp_type%22:%22%22%2C%22professional_designation%22:%22%22%2C%22primary_specialty_code%22:%22%22%2C%22primary_specialty_description%22:%22%22%2C%22secondary_specialty_code%22:%22%22%2C%22secondary_specialty_description%22:%22%22%2C%22email%22:%22%22%2C%22me_number%22:%22%22%2C%22state%22:%22%22%2C%22zip_code%22:%22%22%2C%22tag_id%[redacted]b1%22}};
8f63f140-8046-4ca1-99b4-a90341189132=
{%22lastUpdated%22:1762163948909%2C%22signalData%22:{%22aim_version%22:%224.52.0%22%2C%22event_timestamp%22:%222025-11-03%2009:59:09%22%2C%22country_code%22:%22%22%2C%22country_description%22:%22%22%2C%22dgid%22:%22%22%2C%22first_name%22:%22%22%2C%22identity_type%22:%22UNK%22%2C%22last_name%22:%22%22%2C%22npi_number%22:%22%22%2C%22hcp_type%22:%22%22%2C%22professional_designation%22:%22%22%2C%22primary_specialty_code%22:%22%22%2C%22primary_specialty_description%22:%22%22%2C%22secondary_specialty_code%22:%22%22%2C%22secondary_specialty_description%22:%22%22%2C%22email%22:%22%22%2C%22me_number%22:%22%22%2C%22state%22:%22%22%2C%22zip_code%22:%22%22%2C%22tag_id%22:%[redacted]b1%22}}; dmd-sid4=
{[redacted]
6[redacted]
Content-Length: 4007
Sec-Ch-Ua-Platform: "macOS"
User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/141.0.0.0 Safari/537.36
Sec-Ch-Ua: "Google Chrome";v="141", "Not?A_Brand";v="8", "Chromium";v="141"
Content-Type: application/json
Sec-Ch-Ua-Mobile: ?0
Accept: */*
Origin: https://aim-tag.hcn.health
Sec-Fetch-Site: same-origin
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Sec-Fetch-Storage-Access: active
Referer:
https://aim-tag.hcn.health/iframe.html?client-origin=https%3A%2F%2Fwww.drugs.com&pageview-id=[redacted]
```


Request
Pretty
Raw
Hex
%22timestamp%22:1762163906000%2C%22lastUpdate%22:1762164238000}",
"clientMethod":"pageview",
"clientReferrerUrl":"https://www.drugs.com/imprints.php",
"clientRequestCookies":[
{
"key":"dmd-tag",
"value":"
b1"
},
{
"key":"dmd-sid4",
"value":
}
],
"clientRequestQueryParams":[
{
"key":"color",
"value":"12"
},
{
"key":"imprint",
"value":"60 OP"
},
{
"key":"shape",
"value":"0"
}
],
"clientRequestUrl":"https://www.drugs.com/imprints.php?imprint=60+OP&color=12&shape=0",
"isPageview":true,
"pageTitle":"60 OP White Pill Images - Pill Identifier - Drugs.com",
"pageviewId":"69d1c710-b89c-11f0-80fb-5953e2274b00",
"prerender":false,
"session":{
"id":"a3fe7790-b89b-11f0-a32a-a1d41cee0d83",

**The user then clicks on the relevant drug, Pamelor (fig 10):**



**The embedded DMD Tag triggers a request to HCN-IQVIA servers, carrying a persistent identifier and health-related data such as page titles and drug imprints (figs. 11 and 12):**

**Request**

Pretty Raw Hex \n

```
POST /api/v4/aim-reader/dom-content-loaded HTTP/2
Host: aim-tag.hcn.health
Cookie: dmd-tag=[redacted]b1; dmd-tag=[redacted]b1;
aaef72dc-3586-472b-b5e6-bca780bd6a4e=
{%22lastUpdated%22:1762163947009%2C%22signalData%22:{%22aim_version%22:%224.52.0%22%2C%22event_timestamp%22:%222025-11-03%2009:59:07%22%2C%22country_code%22:%22%22%2C%22country_description%22:%22%22%2C%22dgid%22:%22%22%2C%22first_name%22:%22%22%2C%22identity_type%22:%22UNK%22%2C%22last_name%22:%22%22%2C%22npi_number%22:%22%22%2C%22hcp_type%22:%22%22%2C%22professional_designation%22:%22%22%2C%22primary_specialty_code%22:%22%22%2C%22primary_specialty_description%22:%22%22%2C%22secondary_specialty_code%22:%22%22%2C%22secondary_specialty_description%22:%22%22%2C%22email%22:%22%22%2C%22me_number%22:%22%22%2C%22state%22:%22%22%2C%22zip_code%22:%22%22%2C%22tag_id%22:%22c53ef960-b892-11f0-abe9-096a3f8f99b1%22}};
8f63f140-8046-4ca1-99b4-a90341189132=
{%22lastUpdated%22:1762163948909%2C%22signalData%22:{%22aim_version%22:%224.52.0%22%2C%22event_timestamp%22:%222025-11-03%2009:59:09%22%2C%22country_code%22:%22%22%2C%22country_description%22:%22%22%2C%22dgid%22:%22%22%2C%22first_name%22:%22%22%2C%22identity_type%22:%22UNK%22%2C%22last_name%22:%22%22%2C%22npi_number%22:%22%22%2C%22hcp_type%22:%22%22%2C%22professional_designation%22:%22%22%2C%22primary_specialty_code%22:%22%22%2C%22primary_specialty_description%22:%22%22%2C%22secondary_specialty_code%22:%22%22%2C%22secondary_specialty_description%22:%22%22%2C%22email%22:%22%22%2C%22me_number%22:%22%22%2C%22state%22:%22%22%2C%22zip_code%22:%22%22%2C%22tag_id%22:%22[redacted]9b1%22}}; dmd-sid4=[redacted]
Content-Length: 3929
Sec-Ch-Ua-Platform: "macOS"
User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/141.0.0.0 Safari/537.36
Sec-Ch-Ua: "Google Chrome";v="141", "Not?A_Brand";v="8", "Chromium";v="141"
Content-Type: application/json
Sec-Ch-Ua-Mobile: ?0
Accept: */*
Origin: https://aim-tag.hcn.health
Sec-Fetch-Site: same-origin
Sec-Fetch-Mode: cors
Sec-Fetch-Dest: empty
Sec-Fetch-Storage-Access: active
Referer:
https://aim-tag.hcn.health/iframe.html?client-origin=https%3A%2F%2Fwww.drugs.com&pageview-id=7[redacted]-11f0-a10e-1953dfc6a0ea&session=%7B%22id%22%3A%22a3fe7790-b89b-11f0-a32a-a1d41cee0d83%22%2C%22timestamp%22%3A1762163906000%2C%22lastUpdate%22%3A1762164239000%7D&stps=%7B%22clientWindowNameStore%22%3A%22c53ef960-b892-11f0-abe9-096a3f8f99b1%22%2C%22clientCookieStore%22%3A%22c53ef960-b892-11f0-abe9-096a3f8f99b1%22%2C%22clientLocalStorageStore%22%3A%22c53ef960-b892-11f0-abe9-096a3f8f99b1%22%2C%22clientSessionStorageStore%22%3A%[redacted]b1%22%7D
Accept-Encoding: gzip, deflate, br
Accept-Language: en-US,en;q=0.9
Priority: u=1, i

{
  "clientApiKey":"aaef72dc-3586-472b-b5e6-bca780bd6a4e",
  "clientCookiesRaw":
  "_scor_uid=b2f30b19c0a0433788163bcb50d0fba6; _ga=GA1.1.97910779.1762160094; dmd-tag=[redacted]b1; ddc-detect-cookie=1; pbis_sharedId=b6ba6988-2756-4bba-bea4-26a51772221d; lr_retry_req
```

**Request**


```
QAAUkksSQUlTP+6tKetMd0SvYpQqmCaFV9r9+HbnxBZrq9PGQ84Z9xCIz5ppClmAlA7MfEH85d+aWOQkli6oXEl4TVLnEqtg5lNbT1oW
Wo7vJV3Vtimg++CauBvp9PpTTdnJzjNYxkP6RGWYDRp88WXlgGvsBXb2j/uYgvP+wdiH627G6Lm33/9NJp0Fy98QovY4N6Eckd5zAGXB
z60TPiZ7SxDORwmIcJ8wREzf+M8Kzz2+gI0jJ6vtyXjnkTZX6sLYdmJx0fi5U1g/OWS6DuHDS/MsPL4BDNThXFFC7iOWVxnJm01b5ZkD
Tr23TFCMoWrWb3zPaZohLoODHLqA+fU6yDl82TUxYGrnVpYmFLLsJZWPHiTjtU9c0Md+ivdulbPpvSay2oOHa/Y9N63i3zCfWxeQDKYb
U2Ys2AyMABoNVXZ3ZII0upSuaZyriuQoZE=; __gads=ID=46520f88f3635939:T=1762163918:RT=1762164233:S=ALNI_MZPm4i
jAPDr00ZANbJ3-jnBowSyiA; __eoi=ID=d8430393ba11e349:T=1762163918:RT=1762164233:S=AA-AfjbjKdMBynM8QB3tN4-b
L7Ws; FCNEC=%5B%5B%22AKsRol8Urpko2ZE0e9Oionz314hMUv7Y3OhCpIYs-gNKackY_QlAaHCVuzZc4arJm2fRjS65sXm0C9h-NqY
zq05omnw1w4fY_7vYPRdnUZBi0qW5QeKSp9w9IH1LBdqYtH3t_mOqYHa4CmdevcMYulIrgM4AkkAxsw%3D%3D%22%5D%5D; _li_ss=C
[illegible]
tion_main=1762164552~rv=85~id=14aee0a1a330fa95c06e51021f795080; dmd-sid4={[illegible]
-a[illegible]timestamp%22:1762163906000%2C%22lastUpdate%22:1762164252000}",
"clientMethod":"pageview",
"clientReferrerUrl":"https://www.drugs.com/imprints.php?imprint=60+OP&color=12&shape=0",
"clientRequestCookies":[
  {
    "key":"dmd-tag",
    "value":"[illegible]b1"
  },
  {
    "key":"dmd-sid4",
    "value":
    [illegible]
  }
],
"clientRequestQueryParams":[
],
"clientRequestUrl":"https://www.drugs.com/mtm/pamelor.html",
"isPageview":true,
"pageTitle":"Pamelor Uses, Side Effects & Warnings",
"pageviewId":"71daa990-b89c-11f0-a10e-1953dfc6a0ea",
"prerender":false,
"session":{
  "id":"a3fe7790-b89b-11f0-a32a-a1d41cee0d83",
  "timestamp":1762163906000
},
"sessionId":"a3fe7790-b89b-11f0-a32a-a1d41cee0d83",
"tagId":"[illegible]b1"
}
```

102. **Health.com:** This major, HCN health information website serves millions of Americans seeking medical information. Just like in the drugs.com example above, when a user visits health.com, their device information, together with sensitive health-related browsing and search context, is immediately transmitted to IQVIA via the DMD Tag. This includes full URLs and query parameters that may reference specific medical conditions, symptoms, or treatments. These transmissions occur through IQVIA's web tag script embedded in the website, without notifying the user or obtaining their explicit consent.

103. By way of example, if a user searches for information about bipolar disorder and the user then clicks on a specific article describing health-related data of signs and symptoms of bipolar disorder, all of this data is captured, logged, and transmitted to IQVIA's databases, where it is associated with the user's persistent DMD Tag identifier for further enrichment by IQVIA's partners. The network sessions also include locations and identifiers from IQVIA's third-party advertising partners, such as Chartbeat, Facebook Pixel (fbp) and Google (gads).

104. **Medicalnewstoday.com:** This is a popular HCN medical information website that provides a vast collection of articles and knowledge about various health conditions. In addition to medical information, the site features tools that allow users to search for doctors, treatments, drugs, and more. The medical articles are reviewed by doctors, and users can view the biographies of the reviewing physicians directly on the site.

105. As in the drugs.com example above, when a user visits medicalnewstoday.com, their device information, together with sensitive health-related browsing and search context, is immediately transmitted to IQVIA via the DMD Tag. This includes full URLs and query parameters that may reference specific medical conditions, symptoms, or treatments. These transmissions occur through IQVIA's web tag script embedded in the website, without notifying

the user or obtaining their explicit consent.

106. By way of example, a user may search for information about Endometriosis, then click on a specific article describing health-related data for endometriosis in teenagers. All of this activity is captured, logged, and transmitted to IQVIA's databases, where it is associated with the user's persistent DMD Tag identifier for further enrichment by IQVIA's partners. The network sessions also include locations and identifiers from IQVIA's third party advertising partners, such as Facebook Pixel (fbp), Google (gads) and Sailthru.

b. IQVIA's Real Time ID/Cookie Syncing and Data Sharing With Its Partners

107. As explained above, IQVIA facilitates the ID Syncing process through its DMD Tag infrastructure, designed to align its browser identifiers (dmd-tag and dmd-sid4) with those of external advertising and data partners.

108. When a user visits a website on which the DMD Tag is deployed, the user opening the webpage automatically triggers the DMD code and makes contemporaneous third-party calls to IQVIA or related entities.

109. When the DMD Tag executes, the browser automatically initiates network calls (such as "/partner-tag/" and "/partner-auth"), which simultaneously transmit IQVIA's identifiers alongside IQVIA partners' parameters. This exchange enables IQVIA and its partners to map their respective user or device identifiers, allowing both systems to automatically recognize the same browser in future interactions.

110. For instance, the /partner-auth endpoint associates a user's session with a specific partner, while the /partner-tag/ request links IQVIA's identifier to the partner's ID for cross-platform audience matching. Through this ID synchronization, partners can maintain persistent recognition across domains and sessions, supporting targeted advertising and attribution

workflows.

111. IQVIA's tags and ID syncing processes allow IQVIA to aggregate user data from multiple sources, including browsing behavior, device-level identifiers, and third-party partners, and to use that data to enable audience targeting, identity matching, and behavioral advertising services across the advertising ecosystem. These syncing operations occur automatically in the background, without any user action or awareness, effectively extending IQVIA's data reach across its partner network and reinforcing continuous tracking beyond the original site visit.

112. The below image illustrates how, when a user accesses the drugs.com website, IQVIA initiates an ID sync through a "partner-tag" request with Liveramp, an IQVIA partner and known data collector and aggregator which maintains data profiles on users and operates an extensive data marketplace (fig. 13):



113. The above illustrates that IQVIA's DMD Tag does not merely receive a historical report of the user's interactions after the visit to the website is over. Rather, the deployment of the DMD Tag is part of the live page-load transaction: the user's browser is making contemporaneous third-party calls, reading/sending the user's identifiers, transmitting URL/search context while terms are being inputted and pages are being viewed, and linking the user to IQVIA and related entity IDs while the session is occurring.

114. These transfers occur simultaneously: when Drugs.com webpages load, the DMD Tag causes the browser to fire requests to IQVIA and related entity endpoints during that same page-load sequence. IQVIA and relating entities acquire and read the contents of user communications in real time because cookie syncing requires the system to read identifiers from request headers/cookies, match them, and return or redirect with synced IDs. If the particular request also carries the drugs.com URL address, the user's inputted search term, the user's viewing the pill identifier page, or referrer header, IQVIA is not merely storing a random hit in its system; it is associating health content context with a persistent identity that it and its partners use for commercial purposes in their profiling/marketing ecosystem.

115. By way of further example, just like drugs.com, on the health.com website, when IQVIA's DMD Tag executes, the browser initiates network calls such as "/partner-tag/" and "/partner-auth," which transmit IQVIA's identifiers alongside its data partners' parameters.

116. Furthermore, during the session, IQVIA facilitates an ID syncing process through its DMD Tag infrastructure, designed to align its browser identifiers (dmd-tag and dmd-sid4) with those of external advertising and data partners. When the DMD Tag executes, the browser initiates network calls such as "/partner-tag/" and "/partner-auth," which transmit IQVIA's identifiers alongside a partner's parameters. This exchange enables IQVIA and its partners to map their

respective user or device identifiers, allowing both systems to recognize the same browser in future interactions.

*E. Lack of User Consent*

117. Throughout all of these data collection activities, IQVIA operates without user consent. When users visit websites containing the DMD Tag or participating in the automated programmatic advertising auction system, they have no knowledge that IQVIA is collecting their personal information. Users are never presented with IQVIA's privacy policy, never agree to IQVIA's data collection, and have no opportunity to opt out before their data is transmitted to IQVIA's servers.

118. The data collection begins immediately when a webpage loads, before users can review any privacy policies or make choices about tracking. Even when users consent to a website's own privacy policy, this does not constitute consent for IQVIA's separate commercial data collection. Users do not expect that visiting a medical website means agreeing to have their health searches shared with an advertising company they have never heard of.

119. Most users remain entirely unaware that IQVIA exists, much less that it maintains detailed profiles about information such as their medical searches, drug queries, and browsing patterns across thousands of websites. They cannot consent to something they do not know is occurring.

120. IQVIA's registration as a data broker in California confirms the commercial nature of its data operations. As a registered data broker, IQVIA acknowledges that it collects personal information about consumers with whom it does not have a direct relationship and sells or licenses that information for commercial purposes. This registration places IQVIA squarely within California's regulatory framework for companies that traffic in personal data as a business model.

## FACTS SPECIFIC TO PLAINTIFFS

121. During the Class Period, Plaintiff Rose visited one or more websites that deployed IQVIA's tracking technologies, including the DMD Tag, on her mobile phone's browser in or near her home in California. For example, in July of 2025, Plaintiff Rose used www.drugs.com as a resource to search for information relating to her prescribed medications and to search for information regarding her personal health conditions. Plaintiff Rose was not a registered user of drugs.com and did not have an account with that website. On drugs.com, Plaintiff Rose entered specific search terms into the website regarding her health. She also used the website's pill identifier feature and entered search queries regarding prescribed medications. IQVIA immediately intercepted Plaintiff Rose's personal information, including her IP address, device information, browsing activity, and persistent visitor-id cookie identifier, together with Plaintiff Rose's sensitive health-related browsing and search context. This intercepted data includes full URLs and query parameters referencing Plaintiff Rose's specific medical conditions and treatments. These transmissions occurred through IQVIA's web tag script embedded in the website, without notifying Plaintiff Rose or obtaining her explicit consent. All of this data was captured, logged, and transmitted to IQVIA's databases, where it was associated with Plaintiff Rose's persistent DMD Tag identifier for further enrichment by IQVIA and IQVIA's undisclosed partners. After providing this private information through the drugs.com website, Plaintiff Rose received targeted advertising on social media, and specifically recalls seeing such advertising on Facebook.

122. During the Class Period, Plaintiff Becerra visited one or more websites that deployed IQVIA's tracking technologies, including the DMD Tag, on his mobile phone's browser in or near his home in California. For example, in January and March of 2026, Plaintiff Becerra

used www.drugs.com as a resource to search for information relating to his prescribed medications and to search for information regarding his personal health conditions. Plaintiff Becerra was not a registered user of drugs.com and did not have an account with that website. On drugs.com, Plaintiff Becerra entered specific search terms into the website regarding his health. He also used the website's pill identifier feature and entered search queries regarding prescribed medications. IQVIA immediately intercepted Plaintiff Becerra's personal information, including his IP address, device information, browsing activity, and persistent visitor-id cookie identifier, together with Plaintiff Becerra's sensitive health-related browsing and search context. This intercepted data includes full URLs and query parameters referencing Plaintiff Becerra's specific medical conditions and treatments. These transmissions occurred through IQVIA's web tag script embedded in the website, without notifying Plaintiff Becerra or obtaining his explicit consent. All of this data was captured, logged, and transmitted to IQVIA's databases, where it was associated with Plaintiff Becerra's persistent DMD Tag identifier for further enrichment by IQVIA and IQVIA's undisclosed partners. After providing this private information through the drugs.com website, Plaintiff Becerra received targeted advertising on his social media and specifically recalls seeing such advertising on Facebook, and in other pop-ups, for neuropathy clinics and to volunteer/participate in studies.

123. Upon information and belief, IQVIA identified Plaintiffs, acquired information regarding Plaintiffs' sensitive health information without their consent and created profiles containing their likes and interests.

124. Although discovery has not yet occurred in this matter, Plaintiffs' investigation reveals that the DMD Tag was implemented during the timeframe of Plaintiffs' visits to the drugs.com website.

125. Plaintiffs did not know, nor had reason to know, that unknown third-party IQVIA surreptitiously collected information about their web activity (including their IP addresses) and created profiles about their likes and interests.

126. Plaintiffs did not know that IQVIA was collecting their personal information when they visited HCN websites. Plaintiffs never gave IQVIA consent to intercept their communications and collect data about them.

## CLASS ACTION ALLEGATIONS

127. **Class Definition**: Plaintiffs bring this proposed class action pursuant to California Code of Civil Procedure § 382 on behalf of themselves and a class of others similarly situated, defined as follows (the “Class” or “Class Members”):

> All California residents who visited a website with the DMD Tag embedded, or who otherwise had their personal information collected by IQVIA through its advertising technology, within the applicable statute of limitations (the “Class Period”).
>
> Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants’ subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs’ counsel and Defendants’ counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

128. **Numerosity**: The exact number of Class Members is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendants have surreptitiously collected and analyzed data from hundreds of thousands, if not millions, of consumers who fall into the definition of the Class. Class Members can be identified through Defendants’ records.

129. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the putative Class, and those questions predominate over

any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

A. Whether Defendants read, attempted to read, or learned the content of the communications made by Plaintiffs and the Class;

B. Whether Defendants' actions were willful;

C. Whether Defendants had the capability to and/or used Plaintiffs' and the Class Members' communications for their own purposes;

D. Whether Defendants' software is a pen register;

E. Whether Defendants accessed Plaintiffs' and the Class Members' computer systems; and

F. Whether Defendants obtained consent from Plaintiffs and Class Members.

130. **Typicality**: Plaintiffs' claims are typical of the claims of the Class Members in that Plaintiffs, like all Class Members, have been injured by Defendants' misconduct at issue.

131. **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class. That is, Plaintiffs and the Class Members sustained damages as a result of Defendants' conduct. Plaintiffs also have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

132. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual

controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

133. Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of Cal. Penal Code § 631**
**(<u>On behalf of Plaintiffs and the Class</u>)**

134. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

135. To establish liability under CIPA § 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in

this section.

136. Defendants' software, including the DMD Tag, is a "machine, instrument, contrivance" used to collect communications.

137. When Plaintiffs and Class Members communicate with websites by entering search terms, clicking links, or viewing pages, these interactions constitute communications containing content and meaning. This includes URLs visited, search terms entered, webpage content accessed, and user interactions, all of which are "contents" of communications under CIPA.

138. Defendants, through the DMD Tag embedded across various websites, intercept these communications while they are in transit. Specifically, when users interact with a website, the DMD Tag causes their browsers to transmit the contents of those communications to IQVIA's servers at contextual.IQVIA or contextualtag.IQVIA. This interception occurs in real-time as users' communications are being sent to the intended website.

139. Defendants willfully read, analyze, and learn the contents and meaning of these intercepted communications. IQVIA's systems process the communications to extract URLs, search terms, user interactions, and other communication contents, which Defendants use to build detailed user profiles and provide targeted advertising services.

140. Plaintiffs and Class Members did not consent to Defendants intercepting, reading, or using their communications. No notice was provided, and no opportunity to consent was given before the interceptions began.

141. Defendants use the intercepted communications for their own commercial purposes, including building user profiles, enhancing advertising services, and generating revenue. This use demonstrates that Defendants are not acting as a mere extension of the websites but as an independent party exploiting intercepted communications.

142. Defendants' systematic interception and use of Plaintiffs' and Class Members'

communications while in transit violates Cal. Penal Code § 631(a).

143. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation and injunctive relief.

**SECOND CAUSE OF ACTION**
**Violation of Cal. Penal Code § 638.51**
**(On behalf of Plaintiffs and the Class)**

144. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

145. California law prohibits the installation of a pen register without first obtaining a court order. Cal. Penal Code § 638.51.

146. The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

147. Defendants' DMD Tag is a "pen register" because it is a device or process that records addressing or signaling information—in this instance, Plaintiffs' and Class Members' IP addresses, the websites they visited, derived location information, device identifiers, and other persistent identifiers—from electronic communications transmitted by their devices. Furthermore, Defendants' software is a device or process that identifies consumers, gathers data, and correlates data through sophisticated device fingerprinting and its consumer identification functionality.

148. Defendants' ID syncing constitutes use of a "pen register" because it is a process through which Defendants record addressing and signaling information—specifically, Plaintiffs' and Class Members' IP addresses, the websites they visited, derived location information, device identifiers, and other routing data—from electronic communications transmitted by their devices. Through ID syncing, Defendants can systematically identify consumers, gather routing information,

and correlate this data across multiple websites and devices.

149. Defendants were not authorized by any court order to use a pen register to track Plaintiffs' and Class Members' location and personal information, nor did they obtain consent from Plaintiffs and the Class to operate such a device.

150. Plaintiffs and the Class seek injunctive relief and statutory damages in the amount of $5,000 per violation pursuant to Cal. Penal Code § 637.2.

**THIRD CAUSE OF ACTION**
**Violation of the California Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502**
**(<u>On behalf of Plaintiffs and the Class</u>)**

151. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

152. The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act ("CDAFA") to "expand the degree of protection afforded to individuals ... from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). In enacting the statute, the Legislature emphasized the need to protect individual privacy: "The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." *Id.*

153. Plaintiffs' and Class Members' devices are "computers" or "computer systems" within the meaning of § 502(b) because they are devices capable of being used in conjunction with external files and perform functions such as logic, arithmetic, data storage and retrieval, and communication.

154. Defendants violated the following sections of CDAFA § 502(c), which prohibits:

(a) "Knowingly accesses and without permission ... uses any data, computer, computer system, or computer network in order to ... wrongfully control or obtain money, property, or

data." *Id.* § 502(c)(1).

(b) "Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network." *Id.* § 502(c)(2).

(c) "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." *Id.* § 502(c)(7).

155. Defendants knowingly "accessed" Plaintiffs' and the Class Members' computers and/or computer systems because they purposefully gained entry to and/or caused output from their computers to obtain personal information, including browsing data, device identifiers, IP addresses, and tracking cookies.

156. Plaintiffs and the Class suffered damage and/or loss resulting from Defendants' conduct described herein. Specifically: (1) Defendants' software occupied Plaintiffs' and the Class's storage space on their devices without authorization; (2) Defendants' software caused data to be output from Plaintiffs' and the Class's devices; (3) Defendants' acts used computer resources of the device; and (4) Defendants were unjustly enriched and profited from the data taken from Plaintiffs and the Class.

157. Plaintiffs and the Class now seek compensatory damages, injunctive relief, disgorgement of profits, other equitable relief, punitive damages, and attorneys' fees pursuant to § 502(e)(1)–(2).

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**Violation of Art. 1, § 1 of the California Constitution**
**(On Behalf of Plaintiffs and the Class)**

158. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

159. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All

people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

160. The right to privacy in California's Constitution creates a right of action against private entities such as Defendants. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

161. Plaintiffs and Class Members have a legally protected privacy interest in their IP addresses, location data, and other routing information that IQVIA captures without notice or consent when they access and view websites implementing IQVIA's tracking technologies. These privacy interests are recognized by the California Constitution, CDAFA, and CIPA.

162. Plaintiffs and Class Members had a reasonable expectation of privacy concerning this data when navigating the internet. IQVIA is a third-party data broker with whom Plaintiffs and Class Members have no direct relationship, which IQVIA and its publisher-websites use to collect Plaintiffs' and Class Members' IP addresses, location data, device information, and other routing information across multiple unrelated websites. IQVIA also uses this information to build comprehensive profiles of their online activities.

163. The identifiable and private information IQVIA intercepted, stored, and used without Plaintiffs' and Class Members' consent was used to track them consistently and persistently across multiple websites and to serve targeted advertisements. The manner in which IQVIA intercepted this information deliberately circumvented established privacy-protection mechanisms and violated social norms.

164. Defendants' conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person because: (i) the information collected by IQVIA is personally identifying information protected by the California Constitution and numerous statutes; (ii) IQVIA creates comprehensive profiles of users by linking their activities across multiple unrelated websites and across multiple devices; (iii) Defendants did not have authorization or consent to collect users' IP addresses and other routing information; and (iv) this invasion deprived Plaintiffs and Class Members of the ability to control the dissemination and use of their personal information, an ability that is a fundamental privacy right.

165. Reasonable individuals do not expect that there is an entity intercepting and monitoring their personally identifiable online activity across multiple websites, let alone using this information for profit through its cookie syncing and behavioral targeting services.

166. Defendants' conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiffs. Defendants did not have consent to intercept this information, let alone use and monetize it.

167. As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members have had their privacy invaded and have sustained injury, including the loss of control over their personal information.

168. Plaintiffs and Class Members seek appropriate relief for those injuries, including but not limited to restitution, disgorgement of profits earned by Defendants because of, by way of or in connection with the intrusions upon Plaintiffs' and Class Members' privacy, nominal damages, and all other equitable relief that will compensate Plaintiffs and Class Members properly for the harm to their privacy interests.

**FIFTH CAUSE OF ACTION**
**Violation of the Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

169. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

170. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

171. Defendants engaged in unlawful business practices in connection with their unauthorized collection of Plaintiffs' and Class Members' private information, in violation of the UCL.

172. The acts, omissions, and conduct of Defendants as alleged herein constitute "business practices" within the meaning of the UCL.

173. Defendants violated the "unlawful" prong of the UCL by violating, inter alia, Plaintiffs' and Class Members' constitutional rights to privacy, state privacy statutes, and state consumer protection statutes.

174. Defendants' acts, omissions, and conduct also violate the "unfair" prong of the UCL because those acts, omissions, and conduct, as alleged therein, offended public policy (including state privacy statutes and state consumer protection statutes) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class Members.

175. The harm caused by Defendants' conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further Defendants' legitimate business interests other than Defendants' conduct described herein.

176. As a result of Defendants' violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to valuable

consideration, e.g., access to their private and personal data. Plaintiffs' and Class Members' personal data, including web browsing and device data and personally identifying and addressing information has monetary value. Defendants deprived Plaintiffs and Class Members of that valuable data without providing just compensation. Plaintiffs and Class Members would not have used certain websites had they known Defendants were disclosing their personally identifying and addressing information to third parties through those sites.

177. UCL § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of unfair, deceptive, and fraudulent business acts and practices and may order restitution to Plaintiffs. Plaintiffs and Class Members are entitled under UCL §§ 17203 and 17208 to restitution and restoration of all ill-gotten money and property belonging to Plaintiffs and Class Members in Defendants' possession.

178. As a result of Defendants' violations of the UCL, Plaintiffs and Class Members are further entitled to injunctive relief enjoining Defendants' unlawful and unfair business activities and practices, including an injunction terminating all further distributions of Plaintiffs' and Class Members' personal data. This is particularly true since the dissemination of Plaintiffs' and Class Members' information is ongoing.

**SIXTH CAUSE OF ACTION**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class)**

179. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

180. To state a claim for intrusion upon seclusion, Plaintiffs must establish that: (1) the defendant intruded on a place, conversation, or matter in which Plaintiffs had a reasonable expectation of privacy; and (2) the intrusion would be highly offensive to a reasonable person.

181. Defendants' collection, interception, and use of Plaintiffs' and Class Members'

personally identifiable information, including IP addresses, location information, and device identifiers constitute an intentional intrusion. IQVIA's use of this information to create detailed profiles of individuals through its cookie syncing which tracks and profiles Plaintiffs and Class Members across multiple unrelated websites, likewise constitutes an intentional intrusion.

182. Plaintiffs and Class Members reasonably expected that their IP addresses, location data, and other personal information would not be intercepted, collected, and used by IQVIA—a third-party data broker with whom they have no direct relationship.

183. This expectation is particularly reasonable given that IQVIA operates entirely behind the scenes, with no visible interface for users, no direct services provided to users, and no opportunity for users to review or consent to IQVIA's privacy practices.

184. The information IQVIA collects is especially sensitive because it includes IP addresses (which reveal users' geographic locations) and is used to create comprehensive profiles tracking users' activities across multiple unrelated websites.

185. Plaintiffs and Class Members did not consent to, authorize, or understand IQVIA's interception or use of their private data.

186. Defendants' conduct is highly offensive to a reasonable person because: (a) it violates established social norms and expectations regarding online privacy; (b) it occurs without users' knowledge or consent and provides no opportunity for users to opt out; (c) it creates comprehensive profiles of users' online activities across multiple unrelated websites and across devices through IQVIA's cross-device technology; and (d) it monetizes users' personal information for Defendants' commercial gain without their knowledge or compensation.

187. Defendants' conduct caused Plaintiffs and Class Members harm, including a violation of their privacy interests, loss of control over their personal information, and emotional

distress from the knowledge that their online activities have been secretly monitored and profiled.

188. Plaintiffs and Class Members seek damages to compensate for the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Defendants as a result of their intrusion upon seclusion.

189. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

190. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Abbie Rose and David Becerra individually and on behalf of the Class, pray for the following relief:

(a) An order certifying the Class as defined above, appointing Plaintiffs as the representatives of the Class, and appointing their counsel as Class Counsel;

(b) An order declaring that Defendants' actions, as set out above, violate Cal. Pen. Code § 631, Cal. Pen. Code § 502, and Art. 1, § 1 of the California Constitution, Cal. Bus. & Prof. Code § 17200, and constitute a common law invasion of privacy.

(c) An injunction requiring Defendants to cease all unlawful activities;

(d) An award of statutory damages, disgorgement of profits, punitive damages, costs, and attorneys' fees;

(e) Such other and further relief, including equitable relief, that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: July 27, 2026

Respectfully submitted,

By: /s/ *James C. Shah*

James C. Shah (SBN #260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN #279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
8730 Wilshire Blvd., Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

Katrina Carroll (*pro hac vice* forthcoming)
**CARROLL SHAMBERG LLC**
200 N. LaSalle, Suite 1650
Chicago, IL 60601
Telephone:(872)-215-6205
katrina@csclassactions.com

Don Bivens (*pro hac vice* forthcoming)
don@donbivens.com
Maxwell K. Weiss (*pro hac vice* forthcoming)
max@donbivens.com
**DON BIVENS PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 762-2661

*Counsel for Plaintiffs and the Proposed Class*